SAM LEMEL, Appellant, v. HAROLD S. SMITH AND
RAYMOND A. SMITH, Partners, Doing Business
Under the Firm Name and Style of Harold's
Club, Et Al.

No. 3485

December 3, 1947. 187 P.2d 169.

HORSEY, J., dissenting.

*Morgan, Brown & Wells,* of Reno, for Appellant.

*M. A. Diskin* and *George Lohse,* both of Reno, for Respondents.

## OPINION

By the Court, BADT, J.:

Plaintiff Sam Lemel sued the defendants for damages for false arrest and false imprisonment, joining as such defendants Harold S. and Raymond A. Smith, copartners operating a gambling casino under the name of Harold's

Club, Jack Filtzer, their "floor man" and Charles Nichols and George Stone, police officers of the city of Reno. The case was tried to the court without a jury, and the court rendered its decision dismissing the defendants with their costs and thereafter making and filing its findings of fact, conclusions of law and judgment. From this judgment and from the order denying plaintiff's motion for new trial, plaintiff has appealed. The Smiths and Filtzer on the one hand, and the two officers on the other, filed separate answers and were represented by separate counsel, and it will be seen that somewhat different issues are made as between plaintiff and these two respective groups of defendants. Plaintiff alleged in his complaint that while he was playing dice at Harold's Club at Reno, Nevada, on April 16, 1946, he had occasion to speak to Filtzer concerning the rules of the game and told Filtzer he wanted to talk to Harold S. Smith about such rules, and that while talking to Smith the two police officers, at the order and direction of Smith and Filtzer, by force and violence arrested plaintiff and incarcerated him in the city jail at Reno and detained him in a vile and loathsome place, with drunken, diseased and unclean people, all with oppression, fraud and malice and without probable or any cause and held him against his will for 18 hours during which time they failed and refused to take him before a magistrate or admit him to bail. He alleged that he suffered great mental anguish, was mortified, humiliated and shamed, suffered infectious bites and stings of body lice and other bugs from which a skin disease and eruption were communicated to him, and that he was kept from his business and lawful pursuits to his damage in the sum of $25,000. The Smiths and Filtzer answered, admitting plaintiff's presence in the club, his playing dice and his request to talk to Harold S. Smith, but denying the remaining allegations. As a separate defense they alleged in some detail that plaintiff had been acting in a loud and boisterous manner, that he had cursed and sworn and criticized and found

fault with the manner in which the dealer was carrying on the game, etc., which culminated in the dealer's request to him to leave the game; that he demanded of Filtzer that he be permitted to talk to Smith, continued to argue in a loud and boisterous manner and that Filtzer requested the police officers "to take plaintiff out of the premises," which they did.

As paragraph II of such separate defense, both groups of defendants allege on information and belief that on the following day, April 17, 1946, a criminal complaint was filed against plaintiff in the municipal court of Reno, Washoe County, Nevada, charging him with being a disorderly person in violation of a city ordinance, and that he had on said date entered a plea of guilty to said complaint. The answer of the police officers did not recite the actions of Lemel in Harold's Club but recited that they had received a call directing them to go to Harold's Club, found Lemel still in an altercation, swearing and arguing heatedly, asked him to leave the place voluntarily and that they escorted him from the place; that he then stated that he was determined to go back and settle his differences whereupon they placed him in a police car, took him to the station, "booked" him and turned him over to the desk-sergeant "as required under the established rules and regulations of the police department of the City of Reno." They then, as did the other defendants, recite the fact that he pleaded guilty the next day to the charge of being a disorderly person in violation of the city ordinance. Plaintiff replied to both answers, putting all of the material allegations in issue.

The court's decision deals largely with the facts and held that plaintiff's actions disrupted the business of Harold's Club, and was an interference with its business. With reference to the fact that he was brought to the city jail about 5 o'clock in the evening and that no charge was placed against him until between the hours of 10 and 11 of the following morning, the learned trial

judge said: "The time in which or for which he was incarcerated, approximately eighteen hours—I think we can take judicial notice of the fact that that began about five o'clock in the afternoon, approximately, and continued until regular business matters between ten and eleven o'clock the following morning. And as I understand then, this complainant didn't ask the police department for an attorney. He didn't ask them for bail, but he himself said that he wanted them to call his wife so she would know what had happened to him * * * taking into consideration the time during which this delay is charged as an element of recovery for damages, this was a time when it was not ordinarily convenient for particular or special attention to this particular prisoner at that time." In its formal findings the trial court found in part as follows:

"IV. That defendants, Charles Nichols and George Stone are, and during all times mentioned in said complaint were and now are police officers of the City of Reno, Washoe County, State of Nevada.

"V. That on the 16th day of April, 1946, plaintiff was a patron of and in the gambling premises known as Harold's Club operated by Harold S. Smith and Raymond A. Smith in Reno, Washoe County, State of Nevada, and plaintiff with divers and sundry individuals, including women, was engaged in playing a gambling game known as craps or dice. That several times when the plaintiff threw the dice the dealer caught them with his stick and shoved them back to plaintiff because plaintiff was not shooting them so that they would bounce against the end of the table. That each time it became plaintiff's turn to throw the dice he demanded a change of dice from the dealer. That plaintiff, while engaged in said game criticized and found fault with the manner in which the dealer was carrying on said game, and when plaintiff lost a bet, he cursed and swore in a loud and abusive manner. That on numerous occasions

the dealer in said game requested the plaintiff to stop swearing or else plaintiff would have to leave, but plaintiff continued to swear and use abusive language and in a loud tone of voice to and toward the dealer, whereupon plaintiff was requested to and did cease playing the game and left the table. That while engaged in playing the game of dice, plaintiff's conduct was such as to cause one of the woman players to leave the table and was an interference with and disrupted the business of Harold's Club, and disturbed the peace of said Club.

"That because of the conduct of the plaintiff, the police were called and when defendants, George Stone and Charles Nichols, police officers, entered Harold's Club, they heard plaintiff state in a loud tone 'you can't run this God-damn game this way,' clearly disclosing that plaintiff was still dissatisfied with the game, and when the said defendants, police officers, spoke to plaintiff about coming with them, plaintiff said the game was unfair; it was not straight; and was not on the level, and that he knew the law; thereby imputing publicly that it was a crooked game, prohibited by law. That plaintiff during the course of the conversation and in the presence of defendants, police officers Stone and Nichols, told said police officers that he would not go out voluntarily;

"That if he went out of the Club, the police officers would have to take him, which they did. That at the time defendants, Nichols and Stone, police officers, were at and in Harold's Club, the plaintiff by his conduct was then and there violating the law, and his violation of the law was in the presence of the said officers, Stone and Nichols, which justified them in arresting him. That the said defendants, police officers Stone and Nichols, informed the plaintiff that if he refused to leave Harold's Club voluntarily they would be required to take him by force. That while the said police officers, Stone and Nichols, escorted plaintiff from Harold's Club, plaintiff said to them he was determined to go back and settle

his differences with Harold's Club. That the conduct of plaintiff at Harold's Club as disclosed by the testimony in this case, prior to his arrest by the defendants, police officers, and the statements of the plaintiff to the police officers as they were taking him from Harold's Club, made it plain to the Court that if the plaintiff had been released by the police officers, a serious breach of the peace might have occurred if plaintiff had been permitted to return to Harold's Club, and the Court feels that it is provident that defendants, police officers, did not allow plaintiff, for his own good, to return to Harold's Club.

"That plaintiff was thereafter confined in the City jail at Reno, Nevada, from 5:00 o'clock P. M. until between the hours of 10:00 and 11:00 A. M. of the following day, at which time a regular session of the Municipal Court was held. That plaintiff at no time requested that he be admitted to bail, or be brought before a Magistrate, nor did he request the services of an attorney.

"Taking into consideration the time of day plaintiff was arrested, and the unavailability at that time of the proper officers of the City of Reno for plaintiff's Arraignment, I find from these and other facts established by the testimony that no undue delay occurred in bringing plaintiff before the Municipal Judge of the City of Reno for arraignment.

"VI. That thereafter, and on the 17th day of April, 1946, a criminal complaint was filed before the Municipal Court of the City of Reno, County of Washoe, State of Nevada, charging plaintiff with disorderly conduct and when arraigned before the Municipal Judge on said charge, plaintiff then and there entered a plea of guilty, and a judgment of conviction upon said plea was then entered by the Judge of the Municipal Court, and plaintiff was thereupon sentenced to imprisonment in the City jail for a period of thirty days, said sentence being suspended until 4:00 o'clock in the afternoon of April 17, 1946.

552

"That at no time did Harold S. Smith, Raymond A. Smith or Jack Filtzer request the officers to arrest plaintiff, but they motioned to the officers to take plaintiff out of Harold's Club.

"That the game of dice at which plaintiff was playing was carried on and conducted in a legal and lawful manner."

■ It will be noted that while the findings and conclusions of the court are to the effect that plaintiff's actions at Harold's Club in the presence of the officers justified them in arresting him and that his arrest was justified in that he was then and there disturbing the peace and was guilty of disorderly conduct in their presence, the court did not expressly find that an arrest was made within the club. Lest this be considered mere quibbling, we hasten to state that it would make no difference if the court's language should be construed as a finding that the removal of plaintiff from the premises was an arrest. In this and with regard to other criticisms made by appellant of the court's decision and findings, we have in mind the recognition by this court in Goldsworthy v. Johnson, 45 Nev. 355, 204 P. 505, of the well recognized rule that if the judgment is right on any theory it will not be reversed though the trial judge rendered it on an erroneous theory. We need not go so far in the present case, but may simply note that although some inaccuracies with reference to the facts occur both in the decision and in the findings, we do not find the same serious—certainly not serious enough to warrant a reversal.

■■ As we view the situation in the light of the facts found by the court and which we think find substantial support in the evidence, the events of the evening comprised two episodes. The first episode was concluded when the officers removed appellant from Harold's Club. Appellant contends, and in this our brother HORSEY agrees, that the behavior of appellant in Harold's Club was not such as to justify the trial judge in concluding

as a matter of law that such conduct was objectionable or created a disturbance or justified his arrest or justified his removal. Appellant, while frankly conceding the rule that findings of fact by the trial judge will not be disturbed by this court if finding any substantial support in the evidence, none the less presents this entire situation as a factual one. We see it as a factual one. Appellant's actions in Harold's Club and any provocation of or justification for such actions could without doubt have been submitted for special findings if the case had been tried to a jury. No purpose would be served in quoting the language used by appellant at Harold's Club. He loudly and bitterly cursed his luck, criticized the dealer and the other players at the table. He was, under the court's findings, generally obnoxious, and continued his attitude with Filtzer, the floor man, and Harold S. Smith, one of the proprietors. His language, coupled with his loud and boisterous demeanor, his criticism of other players at the game and other incidents furnish ample support for the court's finding that he was interfering with the business of the club and creating a disturbance. The exact line between a conclusion of law and the finding of an ultimate fact is often difficult to define, but we have no great hesitancy in determining that the court's finding above referred to was the finding of an ultimate fact and that it finds substantial support in the evidence and that it is not the province of this court to interfere with it—whatever our own view might have been had we been the triers of the facts.

■. Respondent Filtzer called the officers and when they arrived, said to them, "Please take this man out." His employer, Harold S. Smith, was with him at the time and made no comment. Appellant first indicated that he would not leave voluntarily, but later consented to go without the application of force. The officers accompanied him to the door. In the course of the oral argument to this court, counsel for appellant was asked, "Is it your contention that when Filtzer said to the officers

'Please take this man out' this was a request for his arrest?" Counsel answered in the affirmative. Yet we find in the appellant's brief: "The respondents, Smith and Filtzer, made the officers their agent for the purpose of ejecting a customer in their establishment. Up to this point they had not themselves arrested the appellant for disturbing the peace nor had they ejected him. They just instructed the officers to take him out * * * they had a right to eject appellant and to use such force as might be reasonable if he were not complying with their rules. This right could have been exercised by Smith or Filtzer or both of them. But this right does not extend to strangers or police officers unless the disturbance is created in the presence of the officers." This right of an owner, through himself or an agent, to eject a trespasser is of course well recognized. 4 Am.Jur. 169, secs. 77 and 78. Further appellant says in his brief: "In law, the officers were acting as agents of Harold S. Smith and Jack Filtzer and not in their capacity as police officers. In doing what? Making an arrest, no, but in ejecting a trespasser on the premises."

We are relieved, by reason of the foregoing statements by appellant, from entering into a discussion of the two conceptions of an arrest—the one being any slight interference with any freedom of movement and the other being an arrest with a view to incarceration and criminal prosecution. To say that the words "Please take this man out" meant that the officers should arrest him, take him to jail and lock him up to the end that Smith or Filtzer might swear to a complaint against him and prosecute him in the criminal courts is stretching the words far beyond their simple and very evident meaning.

■ If then the owners were justified in removing plaintiff from the premises and if he refused to leave peaceably, were such owners then relegated to one of two alternatives (1) either themselves to remove him forcibly or (2) to seek out a magistrate and swear to a complaint and have a warrant issued for his arrest? Or was

there not open to them a third course, a course that most prudent men would pursue—to call an officer and request him to remove the obstreperous offender? This the respondents, Harold S. Smith and Filtzer, did, and although the evidence is conflicting as to just what occurred, the trial court was evidently governed by the testimony of Filtzer and Smith, corroborated by the officers, that Filtzer said, "Please take this man out." It also finds further support in the report of the assistant chief of police which was introduced in evidence by the plaintiff. It reads: "Received call to Harold's Club. Subject was arguing with Bouncer and Harold Smith when we arrived. They stated that they had requested Subject to leave, but he refused. They requested us to take Subject out, which we did." This proof, introduced by appellant himself, is quite at variance with his theory of his cause of action as pleaded in his complaint, namely, that Smith and Filtzer "ordered and directed the police officers to place plaintiff under arrest." Our conclusion is that up to the removal of the appellant from the premises no arrest had been made and no request for an arrest had been made by either Smith or Filtzer.

In the case of Frickstad v. Medcraft, 100 Cal.App. 188, 279 P. 840, 842, plaintiff sued for false arrest and appealed from an adverse judgment. Plaintiff was 79 years of age, suffering from a nervous affliction and infirm and of quarrelsome disposition. He called upon his dentist who made some attempt to adjust the plaintiff's artificial teeth and then stated that he could not do anything more without additional charge. Plaintiff became angry and struck at the dentist with his cane. The latter, in order to protect himself, held plaintiff by the wrists and asked the nurse to call a police officer "to take the plaintiff away." No charge was filed. The court held that the lower court's finding that defendant did not request plaintiff's arrest was sustained by the testimony, and said:

"In this case, the only evidence as to what occurred

when the policeman arrived appears in the testimony of the defendant, which has already been related. The findings of the court have also been heretofore stated in full. These findings are supported by the evidence, which does not justify a conclusion that the defendant advised or encouraged the subsequent imprisonment of the plaintiff. The language of the defendant imports a desire to have the plaintiff removed from the scene of the difficulty, rather than to have him imprisoned. * * * Having performed that duty by promptly having an officer summoned, and by delivering the plaintiff to such officer, his responsibility ceased.

"The defendant's authority and control over the plaintiff ended upon the delivery of the plaintiff to the officer, who thereupon assumed responsibility, and it does not appear that the defendant did anything contrary to the authority conferred upon him by section 847 of the Penal Code. Gisske v. Sanders, 9 Cal.App. 13, 98 P. 43."

Appellant attempts to distinguish this case upon the ground that the delivery of the plaintiff by the defendant to the officer was authorized by special statute in California, and by the further assertion that defendant had already arrested plaintiff by seizing him by the wrists and holding him until the arrival of the officer. However, the case is directly in point in the finding that the defendant's request to the officer to remove the man was not a request for his arrest.

With reference to the defendant's request to the officer, "I wish you would take him away," the California court said: " * * * The defendant said nothing about arresting the plaintiff * * * the evidence * * * does not justify a conclusion that the defendant advised or encouraged the subsequent imprisonment of the plaintiff. The language of the defendant imports a desire to have the plaintiff removed from the scene of the difficulty, rather than to have him imprisoned * * * the fact that a complaint was not filed thereafter does not render the defendant a trespasser, in the absence of an affirmative showing that the defendant actually

encouraged the officer to imprison the plaintiff. No element of malice or abuse of his authority on the part of defendant, up to the time when the policeman took the plaintiff away from defendant's office, appears in the case." Although the case may be in some respects distinguishable from the case at bar, it is directly in point with reference to appellant's contention, more particularly as made in the oral argument, that Filtzer's request to take appellant out was a request for his arrest.

Likewise in Yoder v. Yoder, 239 Pa. 12, 86 A. 523, we quote parts of the opinion as follows:

"On September 23, 1909, Lorenzo T. Yoder was the proprietor of the Hotel Yoder in the city of Pittsburgh and William B. Yoder, his nephew, was manager of the hotel under a written contract by which his services were to be paid for out of a portion of the profits of the business. On September 23, 1909, a dispute arose between the plaintiff and the defendant, and the latter ordered the former to leave the premises. Upon the refusal of the plaintiff to obey the defendant sent for police officers who ejected him. The evidence for the defendant tended to show that while he ordered the plaintiff's removal from the building he did not direct his arrest. The officers locked him up.

"The court charged in part as follows: 'I say to you, first, that if you find by the weight of the evidence that the defendant did not order this arrest, and did not order the plaintiff to be locked up, but merely directed the officers to remove him from the building, he was well within his rights, and you must find a verdict for the defendant.'

"Defendant presented these points:

" '(2) That L. T. Yoder had the right in his discretion at any time to direct William B. Yoder, as his employee, to leave the hotel building, and if William B. Yoder refused or neglected to leave the building, as then directed by L. T. Yoder, that said L. T. Yoder had the right to remove William B. Yoder from the premises by

force, or, at his option, procure an officer to remove him. Answer: Affirmed.

" '(3) That L. T. Yoder, as the owner of the Hotel Yoder, and as the employer of William B. Yoder, had the right to direct him to leave Hotel Yoder, and if William B. Yoder, when so directed to leave refused to obey such direction and L. T. Yoder procured an officer and directed that William B. Yoder be removed from the building, it is immaterial that L. T. Yoder failed to appear at the station house and make a charge against William B. Yoder. Answer: Affirmed if jury find from the evidence defendant did not order the arrest and imprisonment.'

" '(5) If the jury believe from the evidence that all that L. T. Yoder directed the officers called to the Hotel Yoder to remove therefrom William B. Yoder was to remove said William B. Yoder from the premises, without any direction to lock him up or without any statement that said L. T. Yoder would appear against William B. Yoder, then L. T. Yoder is not responsible for any misunderstanding that the officers may have had with relation to direction to locking him up and is not responsible for the detention of said William B. Yoder in Inspector Bartley's office. Answer: Affirmed.' * * *

" '(8) That William B. Yoder, when he was directed by L. T. Yoder to leave Hotel Yoder, was bound to do so, notwithstanding the existence of his contract of employment with L. T. Yoder and what his opinion of his rights were under that contract. His failure to obey the direction to leave made him a trespasser at Hotel Yoder, liable to be removed by force or through the assistance of an officer at the discretion of L. T. Yoder. Answer: Affirmed as qualified by any terms pertaining to said employment contained in said contract.' "

The opinion, referring again to plaintiff's refusal to leave the building after being so ordered by defendant and after referring to defendant's sending for the officers and instructing them to take plaintiff out, says: "In this action the defendant was within his right * * *

as owner, the defendant had the right to order plaintiff from the premises, and in case of refusal had the right to remove him by force, if necessary. He pursued the course which was commended by this court in Sloan v. Schomacker, 136 Pa. 382, 390, 20 A. 525, where it was said that, when the plaintiffs were ordered from defendant's store, 'it was their legal duty to go. In strict law defendant might then have used sufficient force to put them out with his own hands. Instead of doing so, he adopted the prudent and commendable course of sending for an officer.'" The adoption of such "prudent and commendable course" is precisely the one adopted by Smith and Filtzer when they called the officers and requested them to remove the plaintiff rather than attempt to accomplish this themselves.

In Lichtenstein v. New Orleans Ry. & Light Co., 158 La. 284, 103 So. 769, 770, in which an officer was called to help a street car conductor eject a passenger from the car for refusal to pay his fare, the court said: "And what the conductor may do himself in this respect he may cause to be done by an officer of the law." And the railway company was held not responsible for the subsequent arrest of the plaintiff by the police officer.

In Sloan v. Schomacker, 136 Pa. 382, 20 A. 525, the owner of a store had ordered two intruders to leave. They refused to do so and he sent for an officer. No altercation was going on at the time the officer arrived. "In strict law" said the court "defendant might * * * have used sufficient force to put them out with his own hands. Instead of doing so, he adopted the prudent and commendable course of sending for an officer." This seems so clear that further citation of authority is unnecessary. To adopt the highly technical theory advanced by appellant appears to us to be unwarranted. That view is founded first upon the theory that Filtzer's request to remove plaintiff was a request for his arrest, that their escorting him out of the premises was an arrest, and that such arrest without the filing of a complaint and the issuance of a warrant and without the

observance by the officers of appellant's commission of a misdemeanor was a violation of appellant's constitutional rights, was contrary to statute and was actionable. It is our conclusion that up to this point in the events of the evening, this first episode of the affair, under the trial court's conception of the testimony, no cause of action had arisen on behalf of appellant.

It is unnecessary for us to pursue the theory advanced by appellant that if his subsequent arrest by the officers was unlawful, or, if lawful, that the delay between the arrest and the presentation of the charge against him made the arrest unlawful ab initio for the reasons hereinafter stated. But see Brown v. Meier & Frank Co., 160 Or. 608, 86 P.2d 79.

■ Coming then to the second episode, we find appellant expressing the purpose of returning to Harold's Club. Officer Nichols, testifying to the incident of leaving the club said: "We took him out of the place. We just took him out of the place, asked him to stay out, but he refused." He was then asked what actions on appellant's part occasioned taking him to the police station and Nichols testified: "He had left Harold's Club. The only thing that we had to go on, he refused to stay out of the Club. He was going back to have it out * * * He wanted to go back in there and settle the argument * * * He wanted to return to the Club * * * We gave him a chance to go out on his own, to start with, without any trouble, but he was insistent on coming back and finishing his argument." The court's finding that this situation "made it plain to the court that if the plaintiff had been released by the police officers, a serious breach of the peace might have occurred if plaintiff had been permitted to return to Harold's Club, and the court feels that it is provident that defendants, police officers, did not allow plaintiff, for his own good, to return to Harold's Club," would appear from the foregoing testimony to be justified. Appellant has not contended that an arrest would not be justified under these circumstances, but the failure to make this contention would appear to

grow out of the fact that appellant does not grant that the arrest was made outside of Harold's Club, but insists it was made and initiated by taking appellant out of the club. Be this as it may, we do not see how it could be seriously contended that the officers were not justified in arresting appellant to prevent a threatened serious breach of the peace. Concluding then that such arrest was justified under the circumstances, we are confronted with appellant's contention "that by reason of respondents' failure to take appellant before a magistrate, as required by sec. 10764, Nevada Compiled Laws 1929, the lower court should have sustained appellant's action." As the conclusions reached above dispose of appellant's cause of action so far as concerns the respondents Harold S. Smith and Raymond A. Smith, copartners doing business as Harold's Club, and Jack Filtzer, the disposition of the foregoing assignment of error applies only to the respondents Nichols and Stone. The code section above referred to reads as follows: "10764. Person Arrested without Warrant, Duty of Officer. Sec. 116. When an arrest is made without a warrant by a peace officer or private person, the person arrested must, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the arrest is made, and a complaint, stating the charge against the person, must be laid before such magistrate."

Officer Stone's testimony, placed in narrative form describes what was done as follows: "After Mr. Lemel was placed in the car he was taken to the police station by myself and Mr. Nichols. We had him booked. We walked to the booking desk and the desk-sergeant booked him. We stood by waiting for further orders. We assisted in placing him in the cell in the city jail after we had been ordered to do so by the desk-sergeant. The charge that we told the desk-sergeant we had picked this man up on was disorderly person."

"Q. Did you ever at any time place a complaint for disorderly conduct, or any other offense before any

magistrate in this state, county or city, personally? A. We charged him at the time of the arrest.

"Q. In what way? How did you accomplish that? A. When we booked him, we charged him with disorderly conduct.

"Q. And that was based upon what you have testified to happened at the Club. Is that correct? A. Yes, sir. * * *"

Officer Nichols testified: "We did not ever take Mr. Lemel after his arrest before a magistrate for arraignment or for the purpose of fixing bail. We have no right to. The sergeant has charge of a man after he is booked." It will be noted that the testimony indicates the "booking" in one place as "disorderly person" and in another place as "disorderly conduct."

At the trial appellant called the police judge who testified on behalf of appellant that on April 17, 1946, a complaint was filed against Lemel, together with some 18 other defendants, charging the commission of a public offense, to wit:

"By above defendants, who then and there were disorderly persons, not having visible means of support, living idly and loafing and loitering in the streets and public places therein; said defendants then and there having physical ability to work; all of which is contrary to the form, force and effect, and in violation of Section 8 of City Ordinance No. 45 of said City of Reno, in such case made and provided, and against the peace and dignity of the said City of Reno; and this complaint, upon oath, accuses the said defendants of having committed the said public offense, and this complaint further alleges and deposes that the said accused was then and there arrested therefor in the actual commission of the said public offense, and prays that the said accused may be brought before this Court and dealt with according to law." This complaint was signed by Harry D. Fletcher, the Chief of Police. The police judge further testified that his record showed that Lemel pleaded guilty and was fined $30 and a jail sentence effective at 4 p. m.

of that day, which gave him the opportunity for not appearing to serve the sentence. The ordinance, whose violation was charged, namely, section 8 of city ordinance No. 45, does not otherwise appear in evidence. A considerable portion of the briefs filed in this case (and we cannot refrain from noting that the briefs on file aggregate 136 pages) is devoted to the question as to whether or not the subsequent plea of guilty is a bar to the present action. This in turn involves much learned discussion and citation of authority growing out of the fact that Lemel assertedly pleaded guilty to a different offense than the one out of which the present cause of action grows, namely, that he pleaded guilty to a charge of being a disorderly person, which is a part of the municipal vagrancy ordinance, and did not plead guilty to a charge of disorderly conduct or breach of the peace. Out of this situation also arises the appellant's assignment that the trial court committed error in overruling appellant's demurrer to paragraph II of the separate defense of each of the two groups of the defendants. As has been noted, however, such demurrer was interposed orally at the close of the testimony. A sustaining of such demurrer, if effective at all, would have precluded respondents from offering evidence of such plea of guilty. However, the testimony was all in and it appears that the only testimony concerning the guilty plea was that introduced by appellant himself. In addition to this, it may be noted that the trial court while stating that the plea of guilty was a bar to the action, did not base his judgment upon that conclusion, but upon the conclusion that there had been no false arrest. This brief comment obviates the necessity for any lengthy discussion of this phase of the situation and leaves for our consideration the question of liability, if any, resulting from the delay in placing the charge against appellant and bringing him before the magistrate.

The books are replete with cases dealing with such delays and the resulting liability of the arresting officers and of others who caused the arrest. In the present

instance this would apply only to respondents Nichols and Stone. Such cases consider periods of from one hour or less to periods of a great many days, and the conclusions reached by the courts are almost as varied as the cases. The question for consideration is whether in the present case the filing of the charge between 10 and 11 o'clock the following day and the taking of appellant before the police judge at that time comprised an unnecessary delay, or, as put in many of the cases, whether such length of time was unreasonable. Appellant insists that as there is no conflict in the evidence upon the length of time involved, it was entirely a question of law for the court to decide. Respondents insist that it was a question of fact and that the trial court's taking of judicial notice of the circumstances obviated and took the place of other proof. Great reliance is placed by appellant upon the case of Peckham v. Warner Bros. Pictures, 36 Cal.App.2d 214, 97 P.2d 472, 475, decided December 21, 1939. Yet one of the main conclusions reached by the courts in that case was that: "(4) Applying the above stated rules of law to the facts of the instant case, since plaintiff Sorrell was incarcerated for almost twenty-four hours before being released, and in fact never taken before a magistrate, and plaintiff Peckham was incarcerated for more than forty-eight hours before being taken before a magistrate and released, the case was properly submitted to the jury for a determination of the issue as to whether an unreasonable time had elapsed after the arrest of said plaintiffs without taking them before a magistrate."

The same case quotes with approval Keefe v. Hart, 213 Mass. 476, 100 N.E. 558, 559, Ann. Cas.1914A, 716, to the effect that the delay in that case could not be determined as reasonable since "this interval may have overreached the time for the adjournment of the" magistrate's court, and involved a further delay; the question becoming one of law only when the facts are agreed. The finding of the trial court on the point in the instant

case was as follows: "The plaintiff was thereafter confined in the City jail at Reno, Nevada, from 5: 00 o'clock P. M. until between the hours of 10: 00 and 11: 00 A. M. of the following day, at which time a regular session of the Municipal Court was held. That plaintiff at no time requested that he be admitted to bail, or be brought before a Magistrate, nor did he request the services of an attorney.

 "Taking into consideration the time of day plaintiff was arrested, and the unavailability at that time of the proper officers of the City of Reno for plaintiff's arraignment, I find from these and other facts established by the testimony that no undue delay occurred in bringing plaintiff before the Municipal Judge of the City of Reno for arraignment." In his decision the learned district judge said: "The time in which or for which he was incarcerated, approximately eighteen hours—I think we can take judicial notice of the fact that that began about five o'clock in the afternoon, approximately, and continued until regular business matters between ten and eleven o'clock the following morning." Commenting on this, appellant insists that the trial judge "was not considering any evidence in the record of this case * * *totally disregarding the duty placed on the respondents by the Section 10764 * * * and the fact that the law of this state requires the justice courts and city courts to be always open." The latter claim is without merit. The district court is also required always to be open for the transaction of business (N.C.L. sec. 8453), but neither district judges nor justices of the peace have ever been held to a 24 hour a day service by reason of these provisions. Appellant concedes: "If the respondents had introduced evidence in the record to explain the eighteen hour confinement of appellant and upon the record the lower court held for defendants, we certainly could not complain on this appeal." The theory of taking judicial notice of a fact (in case where taking of judicial notice is warranted)

is that it is a judicial short cut, a doing away, in the case of evidence, with the formal necessity for evidence because there is no real necessity for it. Varcoe v. Lee, 180 Cal. 338, 181 P. 223. What is known need not be proved. Peterson v. Standard Oil Co., 55 Or. 511, 106 P. 337, Ann.Cas. 1912A, 625. "Judicial notice takes the place of proof, and is of equal force. As a means of establishing facts, it is therefore superior to evidence. In its appropriate field, it displaces evidence, since, as it stands for proof, it fulfills the object which evidence is designed to fulfill, and makes evidence unnecessary." State v. Main, 69 Conn. 123, 37 A. 80, 84, 36 L.R.A. 623, 61 Am.St.Rep. 30. Judicial notice has been applied to a wide range of subjects from the facts of ordinary life to the arts, sciences and professions, confined only to those things which any well informed person would be presumed to know. Applying this—not to any question as to the reasonableness of the time consumed or to the question as to whether a magistrate might not have been found available or to a question of diligence or lack of diligence—but simply to the hours during which the magistrate's court is found open, we think it entirely within the realm of judicial knowledge that magistrate's courts (unless provision is made for a night court) are not ordinarily open between 5 o'clock in the evening and 10 o'clock the following morning. It further appears from the evidence that the arresting officers were stationed in a patrol car from which it may be fairly assumed that their duties included patrolling certain portions of the city and being subject to call by radio to any point within their jurisdiction in carrying out their duties for the suppression of crime and the protection of persons and property. It appears also that some 18 other persons were incarcerated in the jail and against whom a similar charge was placed the next morning. Many of such other prisoners might have been arrested for misdemeanors occurring at approximately the same hour as the arrest of appellant. So far as the facts disclose neither the appellant nor any of

these other prisoners requested to be brought forth before a magistrate or to be admitted to bail or to have an attorney. It clearly was impracticable for the officers to attempt literal compliance with the statute and it would, in our opinion, be unreasonable to assume that in every one of those cases the officers were subjecting themselves to actions for unlawful arrest and imprisonment. In Fouraker v. Kidd Springs Boating and Fishing Club, Tex. Civ.App., 65 S.W.2d 796, 798, in which the statute required that the arresting officer shall "immediately" take the person arrested before a magistrate, the court said: "Plaintiff was arrested at night and in an intoxicated condition. We judicially know that, in the regular course of official business, magistrates, before whom the statute requires a defendant, arrested without warrant, to be immediately taken, do not keep open office at night; hence, under the circumstances, it was impracticable for the officers to attempt literal compliance with the statutes, and, in our opinion, it is unreasonable to say such was their duty. Under the forbidding circumstances, pending return of the regular time for official business, we think the officers acted with legal propriety."

The last cited case appears to follow the general doctrine as recited in the article on false imprisonment, in 35 C.J.S., sec. 31, where the author says: "What is a reasonable time depends on the facts of each case. Prolonged detention must, however, be considered with regard, among other things, to such matters as judicial accessibility and facilities, the unavoidable duties of the officer making the arrest, the intervention of Sunday or a holiday, and the intoxication or mental condition of the person detained."

In the footnote and likewise in the annotation found in 79 A.L.R. 13, under the title "Delay in Taking before Magistrate or Denial of Opportunity to Give Bail as Supporting Action for False Imprisonment," numerous cases are cited in support of this rule. Among them are: Brish v. Carter, 98 Md. 445, 57 A. 210; Hopner

v. McGowan, 116 N.Y. 405, 22 N.E. 558; Carroll v. Parry, 48 App.D.C. 453; Hayes v. Mitchell, 69 Ala. 452; Johnson v. Mayor, etc., of City of Americus, 46 Ga. 80; Clements v. Canon, 170 Okl. 340, 40 P.2d 640; Raitz v. Green, 13 Ohio Cir.Ct.R. 455, 7 Ohio Dec. 238; Torson v. Baehni, 134 Kan. 188, 5 P.2d 813; Linnen v. Banfield, 114 Mich. 93, 72 N.W. 1.

■ Under the circumstances and in view of the foregoing authorities, we do not feel disposed to hold that as a matter of law the district judge was in error in holding that the delay was not unreasonable. Although not necessary to a determination of the case, we are the more satisfied with our conclusion by reason of an additional factor. Holding, as we do, that the officers were justified in arresting appellant after he had been removed from Harold's Club and when he was asserting his attention to return to have it out, thus threatening a serious breach of the peace, we are then impressed with very respectable authority holding that the liability of the arresting officers ceased when they delivered the prisoner to the officers whose duty it was to take appellant before a magistrate. Gisske v. Sanders, 9 Cal.App. 13, 98 P. 43. This situation appears to be the case from the testimony appearing in the record. As soon as the officers delivered appellant to the desk-sergeant at the city jail, it became the duty of the desk-sergeant to prepare the complaint and bring the appellant before the police judge. That is precisely what happened, and the complaint was signed by the chief of police. The officers after delivering appellant to the desk-sergeant returned to their other duties. It is to be noted that the desk-sergeant is not made a party defendant herein.

In reaching the conclusion that the trial court's findings should not be disturbed we do not wish to be understood as countenancing any evasion of the clear mandate of the statute to take the person arrested without a warrant before a magistrate without unnecessary delay. A very brief delay may be determined to be

unnecessary or unreasonable under a given set of circumstances. Our conclusion is based on the particular circumstances of this case, and after taking into consideration appellant's failure to demand an attorney or to be taken before a magistrate or be admitted to bail; the limitation placed on the duties of the arresting officers; the absence from the case of the desk-sergeant who was responsible for placing the charge against appellant and for his incarceration; the fact that the arresting officers were faced with the performance of other important duties in the prevention and detection of crime and the protection of lives and property; the introduction in evidence by appellant himself of the police record; and his introduction of the record of the magistrate's court showing his plea of guilty. Although we have not found it necessary to hold that such plea was a bar to plaintiff's action (there was some confusion in the "booking"—whether under a charge of "disorderly conduct" or of being a "disorderly person"— and there is a decided conflict in the authorities on the point) the plea of guilty has been considered with the other factors in the case. We have given consideration to the other points raised in appellant's voluminous brief, but find the same to be without merit.

For the reasons herein given, the judgment and the order denying the motion for new trial are affirmed, with costs.

EATHER, C. J., concurs.

HORSEY, J., dissents.